UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LOUISE AKINS,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      No. 4:06 CV 1505 HEA
                                       )                       DDN
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

    This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Louise Akins for disability insurance benefits
and supplemental security income under Title II and Title XVI of the
Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381 et
seq.  The action was referred to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28
U.S.C. § 636(b).

**I.  BACKGROUND**

    Plaintiff Louise Akins was born on March 11, 1954.  (Tr. 25.)
Akins stands 5'2" tall with a weight that has ranged from 178 pounds to
191 pounds. (Tr. 151, 179.)  She has completed ten years of school, and
has not engaged in substantial gainful activity since 1986. (Tr. 10.)
Her last job ended on April 1, 2004.  (Tr. 124.)

    On September 13, 2004, Akins applied for disability benefits,
alleging she became disabled on January 3, 1987, as a result of mental
health problems, diabetes, and knee problems. (Tr. 10.)  Following a
hearing on November 9, 2005, the ALJ denied benefits on January 21,
2006. (Tr. 17, 18.)  On August 10, 2006, the Appeals Council denied
plaintiff's request for review, making the ALJ's decision the final
decision of the Commissioner. (Tr. 3.)

## II.  MEDICAL HISTORY

On June 19, 1995, Akins visited the Deaconess Health System, complaining of abdominal pain.  She described the pain as being off and on for the past six months, but was vague about the nature of the pain.  She had had her gallbladder removed.  Her respiration was normal, and she showed no signs of guarding or rigidity.[1]  Her gait was steady and she showed no acute distress.  (Tr. 273-74.)

On April 26, 1996, Akins visited the Deaconess Health System Emergency Department, complaining of headaches.  A large, eight-inch, piece of plaster had fallen from her ceiling and struck her in the head.  Her appearance was calm and appropriate.  Her speech was clear and she was cooperative.  (Tr. 270.)

On March 23, 2003, Akins was admitted to the Forest Park Hospital emergency room, complaining of abdominal pain in her right upper quadrant, which had begun the day before, after eating a fatty meal.  She said the pain was 9/10.  She had not taken her diabetes and hypertension medication for the past three months because of religious reasons.  She smoked a pack of cigarettes a day, but denied heavy alcohol use.  Dr. Sarat Munukutla, M.D., started her on intravenous fluids, antibiotics, and told her not to consume anything by mouth.  She was diagnosed with acute pancreatitis, diabetes mellitus with poor control, and hypertension.[2]  An examination of her abdomen showed it was soft, but nontender.  On March 25, Akins stated she wanted to go home.  Her condition was stable and the doctors agreed to discharge her.  At the time, she was taking Glucotrol, Glucophage, and Norvasc.[3]  (Tr. 261-65.)

---

[1]Guarding is characterized by a spasm of muscles to minimize motion or agitation of sites affected by an injury or disease.  Stedman's Medical Dictionary, 674 (25th ed., Williams & Wilkins 1990) (1911).

[2]Pancreatitis is inflammation of the pancreas.  Stedman's Medical Dictionary, at 1126.

[3]Glucotrol and Glucophage are used to control high blood sugar.  Norvasc is used to treat high blood pressure.   http://www.webmd.com/ drugs.  (Last visited January 4, 2008).

On March 26, 2003, Akins was admitted to the Forest Park Hospital emergency room, complaining of abdominal pain in her right upper quadrant and epigastric region, spreading to her back.[4] She said the pain was 10/10. Akins stated she was living with her two daughters and working at an advertising agency. She smoked one pack of cigarettes a day, and had a history of noninsulin-dependent diabetes, hypertension, and gallstones. James Parmele, M.D., Robert Wright, D.O, Robert Baird, M.D., and Jonathan Horwitz, M.D., diagnosed her with pancreatitis, diabetes mellitus, and hypertension, administered intravenous fluids, administered morphine to control the pain, and instructed her not to consume anything orally. An examination of the abdomen showed mild guarding in the epigastric and right upper quadrant regions. There was no tenderness, rebounding, hepatosplenomegaly, or other masses.[5] The rest of the abdomen was generally nontender. On March 28, Akins stated she was feeling better and free of abdominal pain. She was insistent on restarting food, and the doctors agreed to do so. She tolerated the food well and was discharged on March 29, 2003. (Tr. 255-59.)

On April 2, 2003, Akins was admitted to the Forest Park Hospital emergency room, complaining of severe abdominal pain. This was her third admission in two weeks, each time for choledocholithiasis and/or pancreatitis.[6] The examining doctors wanted to consult with a gastroenterologist to be sure there were no redundant gallstones left over from a previous cholecystectomy.[7] Akins denied having any pain predating the two-week period. An examination of her abdomen revealed tenderness in her right upper quadrant and the epigastrium. There was no rebound tenderness, lumps, hernias, or other masses. There was no

---

[4]The epigastric region is the central upper quadrant of the abdomen, just below the chest. Stedman's Medical Dictionary, 1339.

[5]Hepatosplenomegaly is enlargement of the spleen or liver. Stedman's Medical Dictionary, 706.

[6]Choledocholithiasis is the presence of a gallstone in the common bile duct. Stedman's Medical Dictionnary, 295.

[7]A cholecystectomy is the surgical removal of the gallbladder. Stedman's Medical Dictionary, 294.

hepatosplenomegaly. Akins was slightly obese, but her heart rate and rhythm were regular. She was advised to reduce or, better yet, quit smoking and not to drink alcohol or carbonated drinks. She was discharged in improved and stable condition, without any pain, on April 5. At the time, she was taking Norvasc, Glucophage, Glucotrol, and Tylenol. (Tr. 248-53, 257.)

Sometime in 2003, Akins visited the Forest Park Hospital for her pancreatitis and to have gallstones removed from ducts. (Tr. 126.)

On December 15, 2003, Akins complained of bilateral knee pain and forgetfulness. X-rays revealed osteoarthritis. (Tr. 215.)

On January 12, 2004, Akins continued complaining of knee pain. She stated she has been homeless for the past year, and unable to find a job or an apartment she could afford. At that point, she broke down crying. "I can't take it anymore. I can't do this anymore." She had been out of her medication for a day, and said she would not be able to get a refill until her husband had been paid. The clinic gave her some sample blood pressure and diabetes medication to last her until her husband could get paid. She had been asked to bring a log book of her glucose levels to the appointment, but she did not. She was diagnosed with depression, but stated she did not want to see a psychiatrist. (Tr. 215-16.)

On January 26, 2004, Akins complained of depression and having social issues, but still did not want to seek counseling. She had not been able to get her medication since the last appointment two weeks ago. (Tr. 216.)

On February 2, 2004, the medical records indicate Akins was not taking her medication. She was still homeless and staying at a learning center, unable to afford an apartment or her medication. The clinic arranged to get her a one month supply of medicine. She was discharged ambulatory. (Tr. 213-14.)

On April 29, 2004, Dr. Daniel Sexton reviewed an MRI of Akins's knee joints. Akins had a history of severe swelling in her right knee. After viewing the MRI, Dr. Sexton diagnosed Akins as having a horizontal

tear involving the posterior horn of the medial meniscus.[8] He also identified chronic marrow change along the medial compartment and medial tibial plateau with medial marginal spurs.[9] There was significant increased joint effusion.[10] He did not identify any displaced flap, and the anterior and posterior cruciate ligaments appeared intact. (Tr. 189.)

On May 17, 2004, Akins complained of right knee pain. An MRI revealed a medial meniscus tear. The notes indicate she was to be referred to an orthopedist. (Tr. 211.)

On June 7, 2004, Akins missed an appointment. (Tr. 211.)

On August 10, 2004, Akins visited Dr. Patrick Gannon at Forest Park Hospital for depression and schizophrenia. He prescribed Risperdal, Trazodone, and Zoloft.[11] (Tr. 126, 208.)

On August 16, 2004, Akins said she was having financial issues. She had not taken some of her medication for fifteen days. At the time, she was complaining of right knee pain. (Tr. 210.)

On August 19, 2004, Akins noted hearing her mother's voice, but refused to see a psychologist. "Do they think I"m crazy," she asked. (Tr. 208.)

On August 26, 2004, Akins reported hearing her mother's voice, but refused any physical exam. Akins said she was unable to fill her prescription because she could not afford it. The co-pay cost was nine

---

[8]The meniscus is a fibrocartilaginous structure of the knee. Stedman's Medical Dictionary, 944. Medial refers to the middle or center. Id., 930.

[9]The tibia is the shin bone, and is the medial and larger of the two bones of the leg. The tibia joins with the femur, fibula, and talus. Stedman's Medical Dictionary, 1600. A spur, or calcar, is a small projection from a bone. Id., 227.

[10]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Stedman's Medical Dictionary, 491.

[11]Risperdal is an antipsychotic drug used to treat mental and mood disorders like schizophrenia. Trazodone and Zoloft are used to treat depression. http://www.webmd.com/drugs. (Last visited January 4, 2008.)

dollars, and the pharmacy appears to have given her a sample. (Tr. 207.)

On September 13, 2004, Akins missed her appointment. (Tr. 206.)

On September 29, 2004, Akins completed a function report. She reported having trouble sleeping, and requiring help to bathe, care for her hair, and putting on socks, shoes, and pants. She said her day consisted of bathing, dressing, cooking, visiting friends and family, going to the store, cooking dinner, and watching television. She noted being able to cook, clean the dishes, and do the laundry without assistance. She was able to walk, ride in a car, and use public transportation. She would shop for food and toiletries about once or twice a month. She would go to church every other Sunday. (Tr. 98-102.)

In the report, Akins noted problems with lifting, squatting, bending, standing for a long time, reaching, walking, sitting, kneeling, stair climbing, seeing, completing tasks, and difficulty concentrating and remembering things. She could walk only one block before needing to rest and could pay attention for up to twenty minutes. (Tr. 103.)

On September 29, 2004, Mya Vaughn, a social worker, completed a function report of Louise Akins. At the time, Vaughn had known Akins for two months and would spend about eight to ten hours with her a week. Vaughn indicated Akins required help with bathing and caring for her hair. Raising her arms is painful, sitting for too long hurts, climbing stairs hurts her knees, and Akins's memory and concentration are limited to the short term. Vaughn believed that Akins needed rest after walking ten steps and could only pay attention for fifteen minutes. When particularly stressed or overwhelmed, Akins would hide in a corner, get into a fetal position, and talk to her deceased mother. Akins has been evicted from her apartments and is dependent on her husband (from whom she is legally separated) to get by. Vaughn noted Akins does not make rational decisions. Akins would miss her medical appointments and her children's medical appointments for no apparent reason. She also does not approach her homelessness with any rational decision-making. (Tr. 104-12.)

-6-

On October 7, 2004, Akins completed a work history report. During the Summer of 2004, she worked for ABM. As part of her job, she had to walk, stand, and stoop for four hours each day. She would lift up to ten pounds, and would lift ten pounds frequently. From 2002 to 2003, she worked for American Staffing. As part of her job, she had to walk two hours each day and stand for six hours each day. She would lift up to ten pounds, and would lift less than ten pounds frequently. The job with American Staffing was the longest job she held. From February to March 1998, she worked for South County Nursing Home. As part of the job, she would walk and stand for eight hours each day. The job required her to assist the patients in walking, and she indicated she would frequently lift up to 300 pounds. Two other past jobs also required her to stand and walk for eight hours each day. The two jobs required lifting no more than ten pounds. (Tr. 90-97, 124.)

On October 11, 2004, Akins reported still hearing voices. She denied any suicidal or homicidal ideation. She was diagnosed with depression or schizophrenia, as well as hypertension and diabetes. (Tr. 206.)

On November 1, 2004, Akins missed an appointment. (Tr. 204.)

On November 15, 2004, Akins complained of pain in the right upper quadrant. The notes indicate Akins missed an appointment the previous week and has "been quite non compliant." Her diabetes was considered out of control and Akins had failed to pick up her prescriptions from the pharmacy. The notes indicate a new prescription would be written. The abdominal pain was considered to be either pancreatitis or choledocholithiasis. (Tr. 202.)

On November 18, 2004, Akins was admitted to the Emergency Room, complaining of pain in her right upper quadrant. The notes indicate she had not taken her medication for three days. Akins was described as having a history of pancreatitis, gallstones, diabetes, and hypertension. At the time, she was smoking ten cigarettes a day, and weighed 191 pounds. (Tr. 179.) Dr. Daniel Sexton diagnosed Akins as having a large amount of stool built up in the colon. (Tr. 180.)

On January 3, 2005, Dr. Sarwath Bhattacharya saw Akins at the Forest Park Medical Clinic. At the time, her chief complaint was that

she was unable to stand for long periods.  Akins stated she was checking
her blood sugar almost daily.  She reported having bi-temporal headaches
almost regularly.  She was living with her daughters, ages 18 and 15,
and had not worked in close to a year.  At home, she would cook
occasionally and watch television.  She was able to walk five blocks and
climb a flight of stairs without problems.  She could stand and sit for
one hour and lift about ten or fifteen pounds.  She smoked one pack of
cigarettes a day.  Her abdomen was soft, with no abnormalities.  She was
able to walk on her own, with a normal gait.  She could squat only
three-quarters of the way down because of knee pain.  Straight leg
raises were normal and there was no swelling, warmth, or tenderness in
the joints.  Dr. Bhattacharya diagnosed psychiatric ailments, diabetes
mellitus, and hypertension.  (Tr. 317-20, 324.)

On January 3, 2005, Thomas Davant Johns, Ph.D., performed a
psychiatric evaluation of Akins.  Akins did not know why she was being
evaluated.  "My regular doctor sent me there.  I think she thinks I'm
crazy, but I'm not."  Akins displayed signs of irritability, but did not
seem particularly depressed.  She noted trouble sleeping and decreased
energy.  Her appetite was normal and weight fluctuations were trivial.
Any difficulties with memory or concentration seemed normal for her age.
Akins estimated her self-esteem was normal and admitted occasional
helplessness.  She denied any thoughts of suicide.  Despite stating she
would hear her deceased mother, Dr. Johns found nothing resembling a
psychotic illness.  (Tr. 324-26.)

Akins told Dr. Johns she last worked six months ago, but quit after
two weeks because she could not stand up.  Akins had never been fired
from a job, and stated she got along well with supervisors and co-
workers and gets along well with the majority of people now.  Akins was
uncooperative during the examination, but coherent, relevant, and
logical.  Her knowledge and judgment were intact.  She would cook,
clean, grocery shop, and do laundry for herself.  She would take public
transportation independently.  She would leave the house two to three
times a week to visit friends, her sister, or to run errands.  Akins was
able, in general, to get along with family, friends, and others.  (Tr.
324-28.)

In light of his examination, Dr. Johns diagnosed Akins with a mild depressive disorder and a guarded personality, primarily due to personality variables. He assigned Akins a GAF score of 75, and believed she was capable of managing her own funds and completing simple tasks in a timely manner over a sustained period of time.[12] At the time, she was taking, Risperdal, Trazodone, Zoloft, Hydrochlorothiazide, Ultracet, Cozaar, Metformin and Glipizide.[13] (Tr. 324-28.)

On January 14, 2005, Tessa Guffey, a senior counselor, completed a case analysis of Louise Akins. Guffey found Akins's alleged physical and mental impairments were not severe. In particular, she noted there was no evidence of organ damage, swelling, or warmth or tenderness in her joints. Akins demonstrated full range of motion. The notes also indicate Akins's diabetes was uncontrolled in November 2004, as a result of her failure to comply with treatment. (Tr. 67.)

On January 14, 2005, Judith McGee, Ph.D., completed a psychiatric review of Louise Akins. Evaluating Akins for affective disorders and personality disorders, Dr. McGee found Akins's impairments were not severe. Dr. McGee noted Akins had mild depressive disorder, and unstable interpersonal relationships and impulsive and damaging behavior. (Tr. 68-77.)

Akins spends her days napping, visiting friends and family, going to the store, cooking, watching TV, and performing household chores.

---

[12]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 75 represents transient symptoms, to the extent any symptoms are present (such as difficulty concentrating after a family argument) or no more than slight impairment in social, occupational, or school functioning (such as temporarily falling behind in work). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[13]Hydrochlorothiazide is used to treat high blood pressure. Cozaar is also used to treat high blood pressure and to help protect the kidneys from damage due to diabetes. Metformin and Glipizide are used to control high blood sugar. Ultracet is used to treat pain, particularly short-term pain. http://www.webmd.com/drugs. (Last visited January 7, 2008).

She had trouble sleeping at night, but had no problem going out alone or preparing meals. She had problems getting along with family members. According to the notes, Akins claimed to hear voices, but denied any suicidal or homicidal ideation. Akins was referred to psychiatric treatment by her physician. "[M]y regular dr sent me there. I think she thinks I'm crazy, but I'm not." (Tr. 78.)

According to the notes, Akins was adequately groomed, completely oriented, and was not delusional or hallucinating. Her judgment and social functioning appeared intact, and she did not demonstrate any disorganized thinking. Ultimately, Dr. McGee diagnosed Akins with mild depressive disorder, and a personality disorder not otherwise specified. She also assigned Akins a GAF of 75. Dr. McGee concluded that Akins's impairment was non-severe. (Tr. 78.)

On January 17, 2005, Akins was admitted to St. Alexius Hospital, complaining of pain in her right hand. A few days ago she had burned her hand. The pain was mild at worst. An examination revealed no abdominal pain, nausea, or vomiting. The abdomen was soft and nontender in all quadrants. Her range of motion was intact and there was no musculoskeletal pain. She was in no distress and appeared well groomed and well nourished. She was discharged in stable condition and instructed to monitor her blood sugar. (Tr. 301-09.)

On January 31, 2005, Akins missed her appointment. (Tr. 199.)

On February 26, 2005, Akins went to St. Alexius Hospital, complaining of right knee pain. Akins said the pain was aching and stinging, 10/10. Increased activity, repositioning, and bearing weight would aggravate the pain. Akins said she was living with her daughters and smoking half a pack of cigarettes a day. She was diagnosed with degenerative osteoarthritis, and had tenderness but no swelling. Akins was discharged ambulatory and in stable condition. (Tr. 293-300.)

On March 29, 2005, Akins stated she was still hearing voices and having trouble falling asleep. She had stopped taking her medication regularly. (Tr. 199.)

On May 22, 2005, Akins saw Dr. Venkata Pante, M.D., at St. Alexius Hospital. She was admitted to the emergency room with hyperglycemia.[14] She had run out of her diabetes medication two and a half or three weeks ago, and had not seen a doctor. She had excessive thirst and excessive urination. After overnight hydration, Akins said she felt better and wanted to go home. She denied any fever, chills, chest pain, shortness of breath, abdominal pain, or any heart problems. An abdominal examination showed no tenderness. Before discharging her, Dr. Pante discussed, at length, the importance of quitting smoking and taking her medication. Akins indicated she understood. (Tr. 276-78.)

On May 31, 2005, Akins saw Dr. Munukutla at Forest Park Hospital, complaining of abdominal pain in the right upper quadrant. Akins stated the pain started some two weeks ago. The pain was 10/10 and had radiated to her upper back. An examination showed her cardiovascular rate was normal and her respiration was clear. The abdomen area was soft, with no guarding or rebound. There was tenderness on palpation at the epigastric region and right upper quadrant. Akins was diagnosed with pancreatitis, diabetes, and hypertension. During the evening of May 31, Akins apparently demanded food or said she would leave the hospital. Later, she stated her pain was resolved, and was seen walking downstairs to smoke on several occasions. After consulting with another doctor, Dr. Munukutla discharged Akins on June 1, 2005, in stable condition. The diagnosis on discharge was pancreatitis. (Tr. 158-69, 221-23.)

The same day, a CT scan revealed the liver, spleen, and kidneys to be a normal size, with no acute abnormalities. The pancreatic duct was mildly enlarged with about three millimeters of calcification in the distal bile duct. From the CT scan, Dr. Bhargavi Patel diagnosed Akins with mild acute pancreatitis. Dr. Munukutla had ordered the CT scan. (Tr. 174-75, 224-25.) As of May 31, 2005, Akins was taking Glucophage, Glipizide, Cozaar, Risperdal, and Trazodone. (Tr. 221.)

In June 2005, Akins was evicted from her home, and had her medication thrown out in the process. (Tr. 196.)

---

[14]Hyperglycemia is an abnormally high concentration of glucose in the circulating blood. Stedman's Medical Dictionary, 740.

On June 27, 2005, Akins visited the Forest Park Hospital Emergency Department, complaining of bilateral knee pain. The notes indicate Akins had run out of her medication and attempted to refill her medication but the clinic was closed. Akins said she could not return to the shelter where she lived without her medication. Akins had gone two weeks without taking her medication. She rated her knee pain as 7-8/10. Akins was ambulatory and "improved" upon discharge. The doctors refilled her prescriptions. (Tr. 150-54.)

On July 14, 2005, Akins was admitted to Forest Park Hospital, complaining of chest pain. Dr. Munukutla ordered a myocardial perfusion scan to evaluate the heart's function and blood flow. The test revealed no evidence of ischemia and abnormal left ventricular ejection of 47%.[15] The doctors noted Akins had a normal heart rate, normal blood pressure, and no arrhythmia. (Tr. 146-47.)

As of August 29, 2005, Akins was taking Hydrochlorothiazide and Cozaar for her high blood pressure, Glipizide and Metformin for her diabetes, Risperdal and Zoloft for anxiety, Trazodone for depression, and Ultracet for pain. (Tr. 127.)

On October 26, 2005, Akins visited Dr. Baird and Dr. Saad Basheer, M.D., at Forest Park Hospital for high blood pressure and high blood sugar. Drs. Baird and Basheer noted Akins "has a history of noncompliance with medicine." Akins noted that she could not afford drugs, having recently moved out of a shelter and into an apartment. Akins had not taken her medication for over a month. At the time, she was supposed to be taking Glipizide, Metformin, Cozaar, Zoloft, and Risperidone.[16] Akins admitted to smoking five to six cigarettes a day. She was stable when discharged. Akins said she could not afford to take a ride to go home. (Tr. 142-44.)

On September 27, 2005, Akins missed an appointment. (Tr. 190.)

---

[15]Ischemia is local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply. Stedman's Medical Dictionary, 803.

[16]Risperidone is an antipsychotic drug used to treat mental and mood disorders like schizophrenia. http://www.webmd.com/drugs. (Last visited January 4, 2008.)

**Testimony at the Hearing**

A hearing was held on November 9, 2005. During the hearing, Akins described her living conditions. For the past two months, she had been living in an apartment with her 18-year old and 16-year old teenage daughters. Her apartment was on the second floor and she used the steps to get there. Before the apartment, she lived in a shelter for about a month. Akins was separated from her husband, and receiving food stamps and Medicaid. (Tr. 334-36, 352.)

Akins last worked sometime during 2005, though she could not remember the exact date. Her job involved packing Bibles, but she only worked one day on the job. She said she "couldn't work no longer. I mean, I barely made it through that day." This was only a part-time job. The last time she had a full-time job was when her children were toddlers. The daily pain in her knees and feet keeps her from standing for long periods, which keeps her from working. Akins also testified to pain in her back, hands, and fingers. For relief, Akins took pain medication. (Tr. 337-41.)

Akins estimated she could sit up straight for a couple of hours before having pain, but could only stand for about twenty minutes. She could only walk a block before needing rest, and walking up and down steps was painful. She could lift a gallon of milk, but no more. Bending and stooping were strenuous, but if necessary, she could do it. (Tr. 341-43.)

Akins said she would hear voices almost every day, and medication did not stop the voices. The voices made sleeping difficult. She was often depressed, wanting to be by herself and wanting to cry. She would cry all the time and reported intermittent problems with anxiety. She had problems making decisions and concentrating. (Tr. 343-47.)

Akins would sometimes do the laundry, but said her children performed most of the chores. Akins said she would cook about twice a week. She seldom went out, but might visit her sister once a week. Akins would see Dr. Gannon, a psychiatrist, once every three weeks and would see her physical doctor about once a month. (Tr. 347-51.)

Akins smokes about half a pack of cigarettes a day. Doctors have put Akins on a diabetic diet, but financial issues make it hard to

-13-

follow. Doctors have also advised her to lose weight, but her knee pain makes it hard to walk. (Tr. 352-55.)

### III. DECISION OF THE ALJ

On January 21, 2006, the ALJ found Akins was not disabled within the meaning of the Social Security Act. (Tr. 17.) The ALJ found Akins had severe physical impairments, as a result of her diabetes mellitus and bilateral knee strain. The ALJ found Akins did not have severe mental impairments. (Tr. 11.)

The ALJ first discussed Akins's medical history, starting in March 2003. The ALJ noted that Akins had been discharged in a stable condition after her March 2003 hospital visit. From there, the ALJ chronicled a history of non-compliance. From 2004 to 2005, various medical clinics noted Akins had missed appointments. After complaining of visions or hallucinations, Akins refused psychiatric consultation. In March 2005, Akins reported she had stopped taking her antidepressant and psychoactive medication. In July 2005, Akins reported she had stopped taking her non-steroidal anti-inflammatory medication. The ALJ found this history of noncompliance detracted from Akins's credibility. (Tr. 11.)

Looking to particular events within the medical record, the ALJ identified a history of noncompliance and instances where examinations failed to find any severe or disabling impairments. For instance, in January 2005, Akins complained about depression. Yet, a psychological examination revealed Akins had a GAF of 75, which indicated only mild psychological symptoms. In January 2005, Akins complained of diabetes and arthritis. Yet, a consultative examination revealed Akins had good range of motion, full grip strength, and full muscle strength in her arms and legs. (Tr. 12.)

In May 2005, Akins was admitted to the hospital. Akins told the doctor she had stopped taking her diabetes medication. The attending physician attributed Akins's symptoms to noncompliance. (Tr. 11-12.) In October 2005, Akins was admitted to the hospital for hypertension and

diabetes.  Akins told the attending physician she had not taken her medication for a month.  Akins was discharged in stable condition.  (Tr. 13.)

The ALJ also noted Akins's ability to perform a variety of chores. She cooked meals, used the stairs, walked on a daily basis, attended church, used public transportation, washed her clothes, shopped for groceries, and visited her sister.  According to the ALJ, the ability to perform these activities on a regular basis detracted from Akins's claims of physical and mental impairment.  (Tr. 13.)  The ALJ also discounted Akins's psychological complaints because of her failure to seek regular psychiatric treatment and her ability to be around other people.  (Tr. 13-14.)

The ALJ discounted Akins's complaints of joint symptoms because there was no evidence she took strong pain medication.  (Tr. 14.)

The ALJ also noted there was no evidence of diabetes-related complications.  There was no evidence of significant weight loss, deep ulcers, congestive heart failure, or end organ damage.  The ALJ added that when Akins took her medication, her blood sugar was controlled. Finally, examinations revealed Akins had clear lungs, contradicting any complaints of breathing problems.  (Tr. 14.)

The ALJ noted that Akins had a history of financial difficulties. Yet, there was no evidence to show Akins was ever refused treatment or medication on account of insufficient funds.  Akins received Medicaid benefits, and the ALJ believed that any money needed for medication could have come from quitting smoking.  The ALJ found the inability to afford treatment was not a factor in Akins's care.  (Tr. 14-15.)

Looking to the record as a whole, the ALJ found no evidence that any doctor had ever imposed long term, significant, and adverse mental or physical limitations on the claimant.  Coupled with the history of noncompliance, her smoking, and her poor earnings record, the ALJ found Akins was not disabled within the meaning of the Social Security Act. In his opinion, the evidence indicated Akins had the residual functional capacity to perform work, except for work that would involve frequent lifting of over ten pounds or occasional lifting of twenty pounds.

Akins could perform a full range of light work, the ALJ concluded.  (Tr. 15-17.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision.  See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A).  A five-step regulatory framework governs the evaluation of disability in general.  See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

Here, the Commissioner determined that plaintiff had the residual functional capacity (RFC) to perform light work.

## V.  PLAINTIFF'S GROUNDS FOR RELIEF

Akins argues the ALJ failed to base his RFC determination on medical evidence and failed to provide a substantial rationale for the

RFC he chose. In support, Akins argues the ALJ understated her knee ailments by referring to them as a "bilateral knee strain," gave too much weight to the opinion of Dr. Thomas Johns, and did not give enough credit to the psychological observations of Mya Vaughn. (Docs. 23, 27.)

## VI. DISCUSSION

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, and the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697.

**Subjective Complaints**

In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called Polaski factors. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). These factors include: 1) the claimant's daily activities; 2) the duration, frequency, and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and 5) functional restrictions. Id. The ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination. Casey, 503 F.3d at 695. The ALJ may discount subjective complaints of pain, if the complaints are inconsistent with the evidence as a whole. Id. When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802. When the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." Casey, 503 F.3d at 696.

In this case, the ALJ found Akins's subjective complaints were not credible. Substantial evidence supports this decision. The record reveals a history of noncompliance on Akins's part. Akins was diagnosed with depression and complained of hearing voices. Yet, twice she refused to see either a psychologist or psychiatrist. In her opinion, "[the treating physician] thinks I'm crazy, but I'm not." Psychologist Thomas Johns examined plaintiff and found no psychiatric illness. In addition, from June 7, 2004, to September 27, 2005, Akins missed no fewer than five appointments. Akins did not drive, but indicated she was comfortable taking public transportation on her own.

On several different occasions Akins had gone days, and sometimes weeks, without taking her medication, aggravating her symptoms. As the ALJ noted, Akins suffered from extreme poverty. At the same time, she received Medicaid and food stamps. Both the pharmacy and the clinic provided Akins with free samples when necessary. There is no evidence Akins was ever refused medication based on an inability to pay. Finally, despite the doctors' insistence, Akins continued to smoke. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (in making a credibility determination, the ALJ may consider a claimant's failure to follow doctors' directions, failure to take medication, failure to seek treatment, failure to keep appointments, and failure to quit smoking).

Akins's daily activities also belied her subjective complaints. In her function report, Akins noted she would cook, clean the dishes, and do the laundry without assistance. Akins also told Dr. Johns she could cook, clean, grocery shop, and do the laundry by herself. Dr. McGee found Akins had no problems preparing meals or going out alone. Dr. Bhattacharya noted Akins could walk five blocks and climb a flight of stairs without problems. While hospitalized, Akins was seen walking downstairs, on several occasions, to smoke. After several of her medical visits, Akins was discharged stable and ambulatory. Akins's apartment was on the second floor, and she used the steps to get there. See Casey, 503 F.3d at 696 ("[I]nconsistencies between subjective complaints of pain and daily living patterns may diminish credibility."); see also Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for child, driving, fixing simple meals, doing

housework, and shopping for groceries did not support claimant's alleged inability to work.).

Under the circumstances, substantial evidence supports the ALJ's decision to discount Akins's subjective complaints as not entirely credible.

**"Bilateral Knee Strain"**

The ALJ considered Akins's knee impairments and found them to be severe. He therefore did not discount her knee problems. In addition, the ALJ considered Akins's ability to climb stairs and perform other daily activities. The ALJ did not err by incorrectly -- or simply inadvertently -- referring to Akins's knee impairments as a "bilateral knee strain." See Wheeler v. Apfel, 224 F.3d 891, 896 (8th Cir. 2000) ("[A]n arguable deficiency in opinion-writing technique does not require [a reviewing court] to set aside an administrative finding when that deficiency had no bearing on the outcome.").

**Weighing Medical Testimony**

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall, 274 F.3d at 1219. The ALJ may reject the conclusions of any medical expert, whether hired by the government or claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey, 503 F.3d at 691. On the other hand, the opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician, when the other assessments are supported by better or more thorough medical evidence. Id. at 691-92. In determining how much weight to give a treating physician's opinion, the ALJ must consider the

length of the treatment relationship and the frequency of examinations. Id. at 692.

In this case, Dr. Thomas Johns, Ph.D., a licensed psychologist, found no significant psychological or mental impairments, and assigned Akins a GAF of 75. Dr. Judith McGee, Ph.D, also conducted a psychiatric review and found Akins did not have any severe psychiatric or mental impairments. She too assigned Akins a GAF of 75. Both Dr. Johns and Dr. McGee seem to have examined Akins only once. On other hand, Mya Vaughn, a social worker, spent significant time with Akins and observed particularly troubling behavior. But as a social worker, Vaughn was not trained to evaluate psychological and psychiatric impairments. See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (noting the "Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); see also 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (same).

The reports of Dr. Johns and Dr. McGee were entirely consistent. Given this consistency, as well as their relevant expertise, the ALJ did not assign too much weight to Dr. Johns's evaluation and too little weight to Vaughn's evaluation.

**Ultimate RFC Determination**

Ultimately, the ALJ found Akins retained the RFC to perform light work. This finding is supported by medical evidence in the record. On June 27, 2005, Akins complained of knee pain, yet was ambulatory and improved upon discharge. At the time of her complaints, Akins had run out of her medication. The month before, while hospitalized, Akins was seen walking downstairs to smoke on several occasions. On January 17, 2005, Akins's range of motion was intact and there was no evidence of musculoskeletal pain. On January 3, 2005, Dr. Bhattacharya noted Akins could walk five blocks and climb a flight of stairs without problems. Dr. Bhattacharya also believed Akins could stand and sit for one hour and lift about ten or fifteen pounds. During a psychiatric evaluation, Akins said she could cook, clean, grocery shop, and do her laundry. She

was also able to take public transportation independently. See <u>Roberson</u>, 481 F.3d at 1025.

When she was able to take her medication, Akins's impairments appeared controlled. See <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997) ("Impairments that are controllable or amenable to treatment do not support a finding of disability."). Indeed, she was discharged in stable condition after a number of her medical visits. And there is no evidence any of Akins's doctors ever placed functional restrictions on her activity. See <u>Hensley v. Barnhart</u>, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability.").

Medical evidence supports the ALJ's RFC determination.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


　　　　　　　　　/S/ David D. Noce
　　　　　　　**UNITED STATES MAGISTRATE JUDGE**


Signed on January 15, 2008.